Ana María Sugar Company, Demandante y Apelante, *v.*
Castro et al., Demandados y Apelados.

Apelación procedente de la Corte de Distrito de Mayagüez
en pleito sobre nulidad de venta.

No. 1912.—Resuelto en marzo 30, 1920.

Nulidad de Venta para Cobro de Contribuciones—Fraude de Acreedores—
Prueba de la Conspiración para Defraudar.—Cuando un acreedor demanda
la nulidad de ciertos actos y contratos llevados a cabo por los demandados,
alegando que son simulados y fraudulentos por ser el resultado de una cons-
piración para defraudarlo, la prueba de tal conspiración debe ser clara, ro-
busta y convincente; con mayor razón cuando el título cuya nulidad se pide
fué adquirido en subasta pública de la finca para pago de contribuciones y
el demandante no ataca la validez de la venta en subasta, de la cual tuvo
conocimiento previo.

Id.—Testimonio de Demandados· en Acción de Nulidad por Fraude—Presun-
ción de Veracidad.—Cuando el demandante alega una conspiración para de-

fraudar, mientras no se pruebe tal conspiración, los demandados no están sujetos a más sospecha que la que pudiera recaer en cualquier demandado llamado como testigo, y sus declaraciones, aunque interesadas, deben presumirse ciertas hasta que no sean debidamente impugnadas.

Id.—ENAJENACIONES NO FRAUDULENTAS.—Una venta para pago de contribuciones no es un traspaso a los efectos del artículo 1264 del Código Civil, referente a traspasos en fraude de acreedores. Ninguna enajenación es fraudulenta si se hace por una causa legal.

Id.—FRAUDE—PRESUNCIÓN DE BUENA FE.—El fraude jamás se presume ni puede probarse por medio de conjeturas; y un demandado a quien se imputa fraude tiene derecho al beneficio de cualquier teoría razonable que sea compatible con la honradez.

Id.—SENTENCIA BASADA EN LAS ALEGACIONES.—Para que se dicte sentencia basada en las alegaciones, la moción debe presentarse antes de que el caso sea llamado para juicio. No puede sostenerse que en el presente caso las contestaciones de los demandados fueran suficientemente evasivas o que no contestaran las alegaciones, para justificar una sentencia basada en las alegaciones.

Id.—ENMIENDAS A LAS ALEGACIONES.—Las cortes tienen discreción para permitir enmiendas a las alegaciones, y no deberá revocarse en apelación la autorización que originó una enmienda, a no ser que la enmienda haya producido sorpresa a la parte contraria.

Id.—COSTAS Y HONORARIOS DE ABOGADO—NULIDAD DE VENTA POR FRAUDE.—No puede estimarse que la corte de distrito cometiera error, en ausencia de prueba de abuso de discreción, al conceder costas y honorarios a favor de los demandados en un pleito en que el demandante alegó y no probó fraude y conspiración.

Los hechos están expresados en la opinión.

Abogados de la apelante: *Sres. Feliú & Alemañy.*

Abogados de los apelados: *Sres. F. Soto Gras, J. Sabater y R. Ramírez Vigo.*

EL JUEZ ASOCIADO SR. WOLF, emitió la opinión del tribunal.

La "Ana María Sugar Company" estableció una demanda en la Corte de Distrito de Mayagüez contra ciertos demandados y habiendo sido dictada sentencia a favor de dichos demandados, la referida "Ana María Sugar Company" interpuso recurso de apelación.

El objeto de la demanda, según expresa la apelante en su alegato, era el rescindir y anular ciertos contratos aparentemente hechos entre los apelados, y anular además determinados actos por ellos realizados en relación con tales contratos. Asimismo, como se indicó en el alegato, la teoría

en la cual se basó la demanda, según la apelante, era que los referidos contratos y actos fueron el resultado de una combinación o conspiración concertada y llevada a ejecución por los apelados con el único fin de defraudar a la apelante.

Como resultado de una venta por contribuciones un supuesto título irredimible surgió en favor de uno de los apelados, pero aun cuando la apelante trató de anular el supuesto título por falta de pago de contribuciones basándose en haberse cometido fraude y conspiración, no ataca en manera alguna la validez de los procedimientos de la venta por contribuciones como tales. En otras palabras, el objeto de la demanda no era atacar los procedimientos gubernamentales por virtud de los cuales se hizo la venta y surgió en el comprador un título que no estaba sujeto a redención, sino únicamente por el fundamento de haber existido actos de confabulación, conspiración y de fraude por parte de los apelados por los cuales tal título por contribuciones se originó o permitió que surgiera en uno de los apelados con perjuicio de la apelante. La demanda es aun más limitada en su teoría.

En noviembre 9 de 1915, el apelado Miguel Castro Rivera, por sí y en su carácter de apoderado de su esposa, reconoció por escritura pública estar adeudando la suma de $5,222.21 a la "Ana María Sugar Company" con motivo de ventas de caña de azúcar y otras negociaciones agrícolas, y en dicha escritura el referido Castro se obligó a pagar dicha suma en varios plazos, cuya deuda, en totalidad, vencería, en defecto de pago de cualquier plazo; y en garantía de esta deuda el referido Castro constituyó hipoteca voluntaria sobre dos fincas, una rústica y otra urbana, con el propósito y para convertir esta obligación en una primera hipoteca sobre dichas propiedades, obligación que en realidad quedó convertida en tal primera hipoteca, que fué debidamente inscrita. La suma de $4,500 de la deuda estaba garantizada por la propiedad urbana y los $722 por la finca rústica.

El día 22 de noviembre de 1915 se constituyó una segunda

hipoteca sobre la finca rústica por el mismo deudor en garantía de un pagaré a favor de la persona que resultare ser tenedor del mismo, cuyo pagaré vino a poder de Francisco del Moral, uno de los apelados, de modo que surgió una segunda hipoteca a favor de dicho del Moral.

Se atacó la buena fé de este alegado pagaré como también otras obligaciones de Castro con del Moral, pero aunque ha surgido alguna duda respecto al importe de esta obligación con motivo de ciertas contradicciones en las manifestaciones hechas por del Moral y Castro, hasta tanto la conspiración quede probada independientemente, ninguna de las manifestaciones del deudor Castro obligarían a su acreedor del Moral. Existe alguna divergencia entre los apelados en cuanto al importe total de esa obligación, pero no podemos en esta apelación dudar del hecho de que aproximadamente la obligación reclamada por del Moral existía. De igual manera, hasta que la conspiración se pruebe, del Moral y Castro no están sujetos a más sospecha que la que pudiera haber contra cualquier demandado llamado como testigo. El examen mismo que hemos hecho de la prueba no nos convence de que sus manifestaciones en cuanto al importe de las obligaciones eran falsas, y tales manifestaciones deben tener el beneficio de la presunción de honradez que existe en favor de todos los testigos hasta que sean debidamente impugnados, o sus declaraciones en sí no merezcan crédito, y esta presunción está favorecida por la conclusión general de la corte. Más adelante en nuestra opinión tendremos oportunidad de ampliar esta discusión. Destruir la veracidad de estas manifestaciones solamente tendería a mostrar una hipoteca y obligación simuladas entre del Moral y Castro y anular sus declaraciones. Creemos que se demostrará que la anulación total de sus declaraciones y la prueba de una obligación completamente simulada no será suficiente para establecer la conspiración en particular, en la cual la apelante ha de confiar para probar su caso. Sin embargo, no es necesario insistir mucho en este

aspecto del caso, pues no vemos que ni la hipoteca ni otra obligación fuera simulada.

En junio 28 de 1916 fueron vendidas a del Moral las dos propiedades por falta de pago de contribuciones, la rústica por la suma de $55.04 y la urbana por $21.25. A la fecha de la venta las dos propiedades probablemente valdrían más del importe de la primera hipoteca, sino algunos miles de dólares más.

En agosto primero de 1916 Castro y la demandante celebraron otro contrato con respecto a la finca rústica, en el cual la apelante convino en redimir dicha propiedad. En el juicio declaró Castro que Alfonso Valdés, el presidente de la corporación apelante, convino al propio tiempo en redimir la finca urbana, y la veracidad de esta manifestación no ha sido negada por Valdés, si bien la apelante dudó de su veracidad debido a las supuestas contradicciones inherentes contenidas en la declaración del mismo Castro. Dicho Alfonso Valdés declaró que tuvo una conversación con del Moral hacia esta fecha, o poco después, en la cual del Moral manifestó que él restituiría la finca rústica a Castro cuando lo viera. Del Moral niega absolutamente haber hecho tal manifestación.

Como el término para la redención venció en junio, 1917, el apelado del Moral en junio 26 de ese año hizo que ambas fincas fueran definitivamente inscritas a su nombre, y en noviembre 26, 1917, traspasó la finca rústica a Justo Vélez, otro de los apelados. La apelante, después de referir la mayor parte de los anteriores hechos en una forma algo distinta, alega que todos estos actos de los apelados se llevaron a cabo por ellos secretamente, valiéndose de la confianza que la apelante tenía entonces en Castro y en del Moral.

En verdad, es duro que una propiedad valorada en muchos miles de dólares pasara de una mano a otra por la insignificante suma de $76.29 y las cortes generalmente están poco dispuestas a sostener tales ventas y las anulan aun cuando solo aparezcan ligeros errores en los procedimien-

tos; pero según los autos ante nuestra consideración estamos convencidos de que, puesto que los títulos mismos por falta de pago de contribuciones no han sido atacados, no. estaríamos justificados en ir contra la conclusión general de la corte de que los hechos estaban en contra de la demandante.

Los apelados, y especialmente Castro y del Moral, eran íntimos amigos. De esto no hay duda alguna, pero ni la amistad ni el parentesco son por sí suficientes para probar fraude o conspiración. La apelante insiste algo en el hecho de que Castro, que era republicano, ayudaría a del Moral, unionista, en su campaña política contra Valdés, republicano, pero el apelado del Moral muy bien llama la atención hacia el hecho de que la supuesta campaña y elección tuvo lugar más tarde. No vemos la importancia que esto tenga en el sentido de demostrar alguna cosa que no sea el hecho, como ha sido referido por el apelado del Moral, de que Castro y él eran antiguos amigos íntimos.

La apelante demostró que Castro era enteramente insolvente y una de las teorías de la apelante—pero no de la demanda—es que los actos u omisiones de los apelados por virtud de los cuales surgió un título por contribuciones en favor de del Moral, eran equivalentes a traspasos hechos en fraude de acreedores, los cuales están prohibidos por el artículo 1264 del Código Civil. Este artículo se refiere específicamente a traspasos y no tiene absolutamente aplicación alguna a los títulos que se originan por ventas por falta de pago de contribuciones. Además, las palabras de ese artículo donde se dice que se presume fraudulenta la enajenación hecha por una persona contra la cual se hubiese pronunciado antes sentencia condenatoria (de las cuales hubo algunas contra Castro), deben ser consideradas en el sentido en que han sido usadas. Ninguna enajenación es fraudulenta si se hace mediante una causa legal. Lo que hay solamente es que la enajenación misma se presume fraudulenta hasta tanto el adquirente muestre que tal enajenación en realidad

se hizo por una causa legal, como sucedería en este caso si ésta fuera una escritura de Castro a del Moral.

Si el resultado de esta supuesta conspiración era meramente dar preferencia a del Moral, tal preferencia la prohibe únicamente bajo ciertas condiciones la Ley Nacional de Bancarrota, ley que necesariamente no está envuelta en este caso. *Coder* v. *Arts,* 213 U. S. 242.

Se discute con bastante amplitud en el alegato la cuestión relativa a la insolvencia de las sentencias contra Castro y sus deudas. Este estado de hechos más bien perjudica que favorece la teoría de la demanda porque como Castro era enteramente insolvente, la disposición de su propiedad sería probablemente cuestión indiferente para él, especialmente si él iba a perder la posesión. Pero, según hemos indicado, esta no es la teoría de la demanda. Las sentencias por insolvencia, deudas de Castro, etc., no se mencionan como hechos ni se alegan como parte de la teoría de la demandante.

Del Moral admite y hasta afirma que habiendo obtenido estas propiedades en una venta en pública subasta por contribuciones, está dispuesto a saldar la obligación de Castro con él, o por lo menos aquella parte de la misma que le debía entonces. El mismo ha favorecido la teoría de que procuraba de ese modo obtener indirectamente una preferencia en sus deudas.

Todas estas consideraciones de insolvencia y otras semejantes tenderían a obscurecer la cuestión principal envuelta en el caso, o sea la supuesta existencia de una conspiración entre los apelados. Si del Moral adquirió estas propiedades por razón de una combinación secreta entre él y Castro con el fin de defraudar a la "Ana María Sugar Company", entonces la insolvencia de Castro importa muy poco. En otras palabras, para probar su caso la apelante tiene que basarse en alguna combinación o entendimiento entre del Moral y Castro que sea fraudulento de acuerdo con la ley, en contra de la "Ana María Sugar Company". En ello es-

triba necesariamente la contienda principal del apelante y el caso debe subsistir o no por virtud de la existencia o inexistencia de tal conspiración.

Creemos conveniente ahora revisar la ley con respecto a las personas que pueden comprar en ventas por contribuciones y obtener un título válido. La ley en los Estados Unidos está bien establecida en cuanto a que el dueño de una propiedad no puede comprar en una venta por contribuciones y obtener un título válido. El no puede comprar en la venta por contribuciones y anular de este modo el gravamen que tiene su acreedor hipotecario. *Gates* v. *Lindley,* 38 Pac. 310; Black on Tax Titles, 273 *et seq.*; Cooley on Taxation, 3rd. Ed. 965; 37 Cyc, 1345–47; *Moss* v. *Shear,* 25 Cal. 45, 85 A. D. 94, y sus citas. Los motivos que sirven de fundamento a esta regla son que el deudor hipotecario está ya en la obligación de pagar las contribuciones y por tanto las cortes interpretarán la compra hecha por él como equivalente a un pago de las contribuciones.

De igual modo aquello que el dueño o el deudor hipotecario no puede hacer para sí directamente, no lo puede hacer indirectamente o por medio de un agente o persona intermediaria, y cuando se adquiere la propiedad en tales circunstancias que una corte de justicia pueda llegar a la conclusión que la compra fué realmente para el dueño; tales ventas serán anuladas en beneficio del acreedor hipotecario. *Gates* v. *Lindley, supra; Beltrán* v. *Villaré,* 41 Southern Rep. 506; *Austin* v. *Citizens' Bank,* 30 La. Ann. 689; *Drake* v. *Sherburne,* 22 S. W. 430 y otros casos citados en las notas al de *Cones* v. *Gibson,* 16 L. R. A. (N. S.) 121 y *Zuege* v. *Nebraska Mortgage Company,* 52 L. R. A. (N. S.) 877.

El principio en que descansan estas citas también es necesariamente que ni el dueño ni la persona intermediaria pueden adquirir una propiedad en una venta por contribuciones porque dicha persona está ya en la obligación de pagar las contribuciones y la compra produce el efecto de un pago. Incidentalmente debe observarse que la demandante

no alegá que del Moral compró y que ahora posee a nombre de Castro, sino que la teoría de la demanda en los párrafos 8, 9 y 10 es que del Moral compró con dinero de Castro. Esta fué también la teoría sustentada en el juicio, haciendo esfuerzos la demandante por probar que todas las deudas de Castro con del Moral eran simuladas. Del Moral sostuvo enfáticamente que compró con su propio dinero.

Podemos asumir que los principios de los anteriores casos son aplicables en Puerto Rico, aunque el sistema del Código Político y de la Ley Hipotecaria con su cancelación de hipotecas inscritas cuando tiene lugar una venta por contribuciones ofrece alguna duda sobre la cuestión. También supondremos, si no resolvemos, que si la prueba hubiera demostrado que Castro en combinación con del Moral dejó de pagar sus contribuciones, permitiendo con esto que un título irredimible por contribuciones surgiera en del Moral, suponiendo siempre un acuerdo secreto entre los dos para llevar a cabo el propósito de la combinación, entonces el título por falta de pago de contribuciones de del Moral era nulo y sin ningún valor y sujeto a quedar anulado por virtud de la acción que pudiera entablar la "Ana María Sugar Company."

Ahora bien, aunque desde luego materialmente es posible que hubiera habido tal combinación o conspiración entre Castro y del Moral, no encontramos en los autos prueba satisfactoria que lo demuestre. De sugerirse que Castro difícilmente hubiera permitido que una propiedad que valía tantos miles de dollars fuera vendida por menos de cien dollars, volvemos a decir que la misma insolvencia de Castro probablemente haría que fuese indiferente en cuanto a la suerte que corrieran estos gravámenes hipotecarios. El estaba completamente agobiado por las deudas. Existían toda clase de pleitos contra él. Probablemente no tenía $79.26 en su poder en ningún momento cuyo dinero no lo necesitase para atender a algo que él creyese más urgente. El sabía de la venta por contribuciones y que del Moral había comprado

en dicha venta y pudo haber sido completamente indiferente respecto a si un título por contribuciones surgió en del Moral o verdaderamente, como alega la apelante, él pudo haber estado muy ansioso de que del Moral en vez de la "Ana María Sugar Company" adquiriera la propiedad, particularmente por ser del Moral su amigo. Los autos revelan que él mostraba un gran desafecto a Valdés y a la "Ana María Sugar Company", pero ni ese odio irreconciliable ni esa indiferencia es una señal de fraude. Es verdad que cuando del Moral quiso que el traspasara la propiedad hizo Castro la protesta de que dicha propiedad valía mucho más que la suma que él debía a del Moral, pero esta protesta es perfectamente compatible con el deseo de obtener algo más para si de del Moral, fuere lo que fuere, particularmente habiendo en la finca rústica cosechas que estaban por recogerse. Sin embargo, en realidad de verdad él entregó la propiedad a del Moral.

La apelante alega que Castro y del Moral ocultaron la segunda hipoteca sobre la finca rústica y solamente la inscribieron después de haber pasado la fecha de la redención. Nos parece que es de muy poca importancia el hecho de que esta deuda estuviera garantizada o no, inscrita o sin inscribirse. La única cosa que podría desempeñar algún papel importante en el asunto era si Castro era deudor de del Moral por la suma de $1,000. Por supuesto, no había duda alguna de que la demandante tenía una hipoteca preferente.

Estas consideraciones resuelven los primeros cinco puntos que figuran en el alegato de la apelante en la discusión del noveno error.

El sexto punto es el más importante y al discutirlo trataremos más o menos directamente de los otros quince puntos con excepción de aquella parte que se refiere exclusivamente al apelado Vélez. El sexto punto específicamente se refiere a la actitud y conducta de del Moral y Castro hacia la demandante.

Habiéndose imputado una conspiración entre del Moral

y Castro, es importante el tratar de precisar el principio que pudo tener esta conspiración. No existe prueba directa de tal conspiración pero como ocurre generalmente en casos de conspiración, las pruebas frecuentemente se presentan indirectamente, o por medio de prueba circunstancial. ¿Cuándo empezó esta conspiración entre Castro y del Moral? Parece imposible, conocida la actitud casi invariable de un hombre que es enteramente insolvente, que Castro deliberadamente no pagara sus contribuciones con la sola idea de favorecer a del Moral y perjudicar a la "Ana María Sugar Company." Como ocurre generalmente con los deudores insolventes, él probablemente no pagó las contribuciones a su vencimiento por razón de su propia conveniencia. Esta es la deducción a que puede llegarse de acuerdo con el sentido común y de la presunción de honradez.

Según el artículo 315 del Código Político, en todos los casos en que se embargaren y vendieren bienes raíces para el pago de contribuciones, el Tesorero de Puerto Rico notificará la inscripción de dicha venta a todas las personas que tuvieren una hipoteca o gravamen sobre dicha propiedad, consignando en la notificación la fecha de la venta, la suma en que se hubiere vendido la propiedad y los demás datos que estimare oportunos. Es de presumirse que la "Ana María Sugar Company" tenía tal aviso y dice Valdés que él hizo mención de este hecho en su conversación con del Moral. Todo el mundo tuvo conocimiento de todo lo que pasaba.

La prueba tiende fuertemente a acreditar, como admite la apelante, que fué Castro quien insistió en que la "Ana María Sugar Company" redimiese el título por contribuciones que estaba pendiente sobre la finca rústica y tal convenio se hizo constar en el contrato de Castro con la "Ana María Sugar Company" cuando hicieron ellos un nuevo arreglo con respecto a dicha propiedad. Decir que Castro y del Moral conspiraban entonces es suponer en Castro cierto grado de malicia y astucia diabólica que raras veces se encuentra en un ser humano. Uno tendría que suponer que él persua-

dió a la "Ana María Sugar Company" hacer este contrato para redimir la propiedad en la esperanza de que ellos quedarían tranquilos en cuanto a ambas propiedades por razón del convenio, suposición que es enteramente absurda. Es asimismo completamente absurdo, en vista de la ley relativa a la notificación a los acreedores hipotecarios y el conocimiento real de la venta por contribuciones que tenía Valdés, suponer que Castro, que era enemigo de la "Ana María Sugar Company," les apresuraba para que redimiesen la propiedad cuando al propio tiempo existía una conspiración entre él y del Moral. Creemos que podemos prescindir de cualquier idea respecto a que existía una conspiración entre del Moral y Castro para defraudar a la "Ana María Sugar Company" en la fecha en que se firmó el contrato entre Castro y la "Ana María Sugar Company". Los autos en conjunto nos convencen de que no existía ninguna conspiración ni podía existir antes de que tuvieran lugar las ventas por contribuciones. ¿Cuándo fué entonces que surgió la conspiración?

Del Moral ya había comprado la propiedad y fuera de una conspiración la adquiriría libre de reclamaciones de todo el mundo con tal que no hubiese irregularidad en la venta por contribuciones y él no tenía tales relaciones con la propiedad por las que estuviere obligado a pagar, él mismo, las contribuciones. De modo que la forma que la conspiración tenía que tomar en esta fecha era una por la cual del Moral fraudulentamente entraba en una combinación en la que Castro no iba a redimir la finca rústica. Había un contrato existente por parte de la "Ana María Sugar Company" para ella misma redimir con cargo a Castro. No encontramos absolutamente ninguna prueba de que hubiera tal convenio específico entre Castro y del Moral. La apelante no nos pide que hagamos la escueta inferencia, esto es, un convenio de no redimir, pero nos pide que supongamos un estado general de fraude y conspiración de actos y conducta subsiguientes, así como las supuestas admisiones de del Moral y Castro.

Pero sostenemos que era necesario para la apelante probar, teniendo en cuenta suficientes circunstancias faltando las demás alegaciones de su demanda, una conspiración por parte de del Moral y Castro para que el último no pudiera redimir la propiedad.

La apelante insiste grandemente en la diferencia que hay entre la finca rústica y la urbana puesto que nó hubo convenio específico por parte de la "Ana María Sugar Company" en redimir la finca urbana; pero ya que hubiera habido tal convenio o no de redimir la finca urbana la "Ana María Sugar Company" fué notificada del título por contribuciones pendientes y que tenía que ser redimida para impedir que surgiera un título en del Moral y lo mismo en cuanto a cualquiera de las propiedades y debía probarse una conspiración para inducir a Castro a que no redimiese la propiedad—empresa casi imposible. La explicación del motivo por qué Castro no insistió en hacer un convenio específico acerca de la redención de la propiedad urbana fué que entonces él estaba tratando con la "Ana María Sugar Company," y el contrato que había de firmarse se refería solamente a la finca rústica. Considerado el hecho de que la "Ana María Sugar Company" tenía conocimiento de la venta por contribuciones; considerado también el hecho de que Castro así lo dice, estamos dispuestos a creer la manifestación hecha por el último de que también él le pedía a Valdés que redimiera la propiedad urbana.

Si este fuese un caso de accidente, nos inclinaríamos a decir que la causa próxima del accidente fué el descuido de la "Ana María Sugar Company" en redimir la propiedad y no la conducta ya de del Moral o de Castro. De todos modos es difícil concebir una conspiración existente entre del Moral y Castro cuando la "Ana María Sugar Company" ya estaba obligada por un contrato a pagar las contribuciones de la finca rústica y había convenido, según tiende a demostrar la prueba, en redimir la propiedad urbana.

La apelante hace cierta alegación de que del Moral con-

vino en volver a traspasarle la finca a Castro. Independien-
temente del hecho de haber sido negado esto por del Moral
y aunque su conducta pudiera entonces caracterizarse como
mala o engañosa o algo por el estilo, su omisión en cumplir
su alegada promesa a Valdés no tiende a mostrar una cons-
piración entre él mismo y Castro. El estaría quizás favo-
reciéndose indebidamente. Suponer, además que del Moral
intencionalmente indujo a la "Ana María Sugar Company"
a permanecer en un estado de inacción por su manifestación
a Valdés, es como en el caso de Castro, suponer una vez más
una increíble astucia por parte de del Moral.

Los principios de los casos relativos a los dueños o a una
persona intermediaria que compra no pueden tener aplica-
ción a un período después de la venta y antes de la reden-
ción. Las contribuciones han sido satisfechas. Nadie tiene
la obligación de pagarlas. La redención es un privilegio o
un derecho que tiene una persona interesada en la propiedad.

Podemos concebir, en vista de los autos, los hechos en
este caso como que han ocurrido más o menos en esta forma:
Castro dejó de pagar sus contribuciones. Del Moral compró
las propiedades en una venta por contribuciones. Aunque
no tenía por costumbre adquirir títulos por falta de pago
de contribuciones él declaró que a veces lo hacía para pro-
tegerse. Las cosas siguieron así hasta que había pasado la
fecha de la redención cuando él se aprovechó de la situación
para inscribir la propiedad en su propio nombre libre de
hipotecas. Castro, si en algo confió fué en la garantía de
su convenio con la "Ana María Sugar Company." Teniendo
del Moral el título a ambas propiedades y siendo su primi-
tivo objeto únicamente asegurar sus deudas o quizás su ale-
gado gravamen hipotecario, no se creyó seguro con su título
por contribuciones, que generalmente son tan inseguros, pero
no quería retener la propiedad en oposición a Castro y per-
mitir que las deudas de Castro siguieran al mismo tiempo.
Por consiguiente, una vez que el título por contribuciones
había vencido y las hipotecas habían sido canceladas él tuvo

cierto entendimiento con Castro por el cual, mediante la entrega de la posesión de las propiedades, él, de acuerdo con su pensamiento original, abonaría a Castro el importe de sus obligaciones pendientes. Tal vez es por esta razón que del Moral dijo al ser examinado como testigo, que Castro le debía y no le debía, queriendo decir con esto que él quizás tenía otras deudas existentes, o tal vez que tenía una reclamación legal continua contra Castro si su título por contribuciones resultare infructuoso.

De todo modos, no necesitamos penetrar en todas las posibilidades que pudieran estar en favor de la honradez tanto, de Castro como de del Moral. El fraude jamás se presume y los demandados a quienes se imputa fraude tienen derecho al beneficio de cualquier teoría razonable que sea compatible con la honradez. Los fines y actos de del Moral y Castro pueden haber sido enteramente diferentes de los que hemos reseñado, pero la presunción está en favor de la honradez hasta tanto se pruebe "claramente" lo contrario.

Hemos examinado particularmente la declaración de del Moral. Es sumamente franca y tiene todas las características de honrada. El admite haberle abonado a Castro todas las obligaciones que existían con anterioridad a la venta por contribuciones y haberle cargado el importe de las ventas por contribuciones. Admite sin reservas su amistad. Sus mismas contradicciones son "indicios" tan comunes quizás de un testigo honrado como de una persona que está ayudando a una combinación. Su interrogatorio directo tuvo lugar al ser llamado como testigo de la demandante. Si se comenta en el hecho de no haber negado él la conspiración, puede argüirse que no estaba obligado a negar tal conspiración en la silla testifical por cuatro razones importantes, a saber: *Primera*, porque no recae en una parte ninguna obligación de negar manifestaciones que la demandante está obligada a probar o por lo menos hasta que se pruebe un caso *prima facie*. Entre otros particulares, la Ley de Evidencia prescribe en su artículo 162 que "en los casos civiles

la afirmativa en una cuestión deberá probarse, y cuando la evidencia fuere contradictoria, la decisión deberá pronunciarse de acuerdo con la preponderancia de pruebas.'' *Segunda,* porque no se le hizo tal pregunta por la parte que le llamó y que tenía derecho a hacerle la pregunta sin estar obligado por su contestación. *Tercera,* porque él había jurado la contestación y bajo circunstancias muy especiales. Mientras la demandante, con la tolerancia de los demandados, más bien estaba repreguntándole que interrogándole directamente, surgió el hecho de no aparecer jurada la contestación bien por descuido del secretario o por alguna causa que no consta. Entonces, después de una discusión, la corte le dió permiso para jurar la contestación en el juicio. La corte, sin embargo, ordenó a del Moral que leyera la contestación antes de jurarla. De modo que el juramento se hizo en corte abierta, y en cuanto concierne a su fuerza obligatoria, revestía mayor solemnidad. Si los hechos eran falsos él quedaba tan sujeto a un proceso por perjurio como si voluntariamente hubiera declarado en cuanto a la inexistencia de la conspiración tan enfáticamente negada en la contestación. Aquí el demandado fué a la silla de testigos varias veces y negó todos los hechos esenciales de los cuales podía inferirse la conspiración. *Cuarta,* porque sería igual a negar una conclusión de los hechos hacer cualquiera otra negativa.

Tanto del Moral como Castro niegan rotundamente los hechos como se alegan en la demanda o sea que del Moral compró con dinero de Castro o que había un entendimiento entre ellos. Castro dice que del Moral compró la propiedad por contribuciones sin decírselo. Si eso era cierto, como la corte tenía el derecho a creer en vista de toda la prueba que no hubo convenio o entendimiento entre del Moral y Castro con anterioridad a la compra inicial del título por contribuciones, entonces, como este es el verdadero punto fundamental de la alegada conspiración, toda la estructura debe caer por su peso. *Debile fundamentum fallit opus.*

Consideremos otro punto en el cual ha insistido mucho la apelante. Fructuoso Ojios fué llamado como testigo · de la demandante. Se preguntó al testigo si había tenido alguna conversación con del Moral respecto a las propiedades adquiridas por del Moral en las cuales estaba interesado Valdés y contestó "Sí". El manifestó que como jefe político tenía que ver con el advenimiento de Castro al partido y que él manifestó sus dudas a del Moral de la certeza que tenía de la fidelidad de Castro por razón de su obligación de pagar a Valdés. Entonces del Moral dijo: "No te apures, yo estoy entendido con él". No consta cual fué el entendimiento. Pudiera haber sido la influencia que del Moral tuviera sobre Castro por centenares de razones. El conocimiento de un delito, la enemistad con Valdés, la promesa de prestar más dinero o hasta la reconocida antigua amistad, sería bastante para explicar este convenio. La mera cuestión de una antigua amistad es bastante para que uno sepa hasta qué punto se puede confiar en el amigo. Pero esta conversación tuvo lugar después que el título por contribuciones había sido perfeccionado. Un convenio en esa fecha no prueba nada en absoluto. Por eso no es de extrañarse que del Moral no se sintiera obligado a negar la conversación, de ser falsa, o que la corte dejara de considerarla debidamente como insistió la demandante.

Las autoridades están en conflicto acerca de qué prueba es necesaria para establecer el fraude, pero creemos que todos los casos están de acuerdo en cuanto a la necesidad de que debe probarse el fraude por lo menos "claramente." Esta corte, además, ha insistido siempre en que la prueba de fraude debe ser claramente establecida. *Calzado* v. *Carrera,* 15 D. P. R. 363; *Igaravídez* v. *Rubert Hermanos,* 23 D. P. R. 293. Y citamos una vez en el mismo sentido el caso de *Lalone* v. *United States,* 164 U. S. 255, citado asimismo en las notas del tomo 12 R. C. L., pág. 436–49.

Ahora bien, ya que el fraude deba establecerse mediante una preponderancia de prueba o por prueba robusta o por

prueba fuera de duda, queda en pie el hecho, según ha sido establecido por las cortes, de que el fraude jamás puede ser cuestión de mera conjetura. 10 R. C. L. 323. Creemos que tendríamos que divagar extensamente en este campo de conjeturas para convencernos de que existía la conspiración.

Hemos estado considerando este caso a veces bajo la teoría en cierto modo de que quizás no deba darse mucho crédito a las manifestaciones de del Moral y de Castro. Del Moral y Castro fueron llamados como testigos por la demandante. Ahora bien, si hay que dar alguna fuerza al hecho de que ellos fueron llamados por la demandante o no, ambos testigos tienen derecho al beneficio que les otorga el artículo 21 de la Ley de Evidencia, o sea que se presume que un testigo declara la verdad.

Otros principios de la Ley de Evidencia son aplicables en favor de la honradez de los testigos. Véase el artículo 102, párrafos 1 y 19 (Compilación de 1911, pág. 311), como sigue:

1. Que una persona es inocente de delito o falta.

19. Que las transacciones privadas fueron realizadas con rectitud y en debida forma.

Hemos aplicado estos principios en los siguientes casos: *González* v. *Santini*, 26 D. P. R. 553; *Díaz* v. *Torres*, 17 D. P. R. 501; *Zalduondo* v. *Sánchez*, 15 D. P. R. 231; *Luard* v. *Herederos Desconocidos de Andrés Antelo*, 14 D. P. R. 418, un caso en el cual revocamos la sentencia de la corte inferior haciendo aplicación de estos principios.

Aun cuando interesadas las declaraciones de las partes tienen derecho a ser creídas hasta que se presente alguna razón legal para sospecharse de tales declaraciones. Del Moral y Castro prestaron declaraciones importantes tendentes a combatir la teoría de la demanda. Sus declaraciones tienden necesariamente a destruir el caso de la apelante y tienen derecho a la debida consideración por nosotros sin que sea necesario tener en cuenta la actitud de la corte inferior,

suponiendo, lo cual no es lo que sucede, que éste era un caso sometido a nuestra consideración en primera instancia.

La corte inferior, sin embargo, oyó toda la prueba y podía saber mejor que nosotros cual era el crédito que debía darse a todos y cada uno de los testigos, y después de una conclusión general hecha por la corte inferior la presunción del artículo 21 de que los testigos dicen la verdad queda robustecida y necesitaremos un caso muy fuerte para dudar de la tendencia de la manifestación de cualquier testigo, aun cuando fuese interesado.

Podemos hasta dudar si hubo algún conflicto sustancial en la prueba. La apelante aparentemente desearía que creyéramos la teoría de su caso debido a la alegada improbabilidad de la veracidad de la manifestación hecha por del Moral y Castro y además por ciertas contradicciones inherentes. La actitud de las cortes de apelación hacia la conclusión general de la corte inferior, o cuando la prueba es contradictoria, ha sido resumida por nosotros con frecuencia pero no estará demás que hagamos una nueva cita del tomo 4 de Corpus Juris, pág. 887.

"§ 2857. — *Conclusiones en contra del peso de la prueba.* — Lo mismo que en el caso de un veredicto de un jurado, una corte de revisión no intervendrá con las conclusiones de una corte sentenciadora meramente porque éstas aparezcan estar en contra del peso o preponderancia de la prueba. En otras palabras, una conclusión aunque resulta estar en contra de la preponderancia de la prueba no será modificada si está sustentada por prueba sustancial o por prueba que legalmente sea suficiente para sostenerla, o a menos que las conclusiones están clara y palpablemente en contra del gran peso de la prueba, a menos que la prueba claramente exija una resolución en sentido contrario, a no ser que la conclusión sea tan manifiestamente contra el peso de la prueba que un juez sentenciador anulara un veredicto semejante dictado por virtud de la misma prueba o a no ser que la conclusión esté tan claramente en contra del peso de la prueba que indique error, prejuicio o indebida influencia. Sin embargo, una conclusión quedará sin efecto cuando clara y palpablemente esté en contra del gran peso de la prueba o cuando la prueba sea tal que si el caso hubiera sido juz-

gado por un jurado la corte hubiera estado en la obligación de ordenar que se dictara un veredicto a favor de la parte contraria.

*Fundamento de la regla.*—Está reconocido que hay muchas cosas que no pueden incluirse en los autos impresos pero que pueden ser debidamente considerados por una corte sentenciadora y que son de gran significancia y a menudo regulan la determinación de la verdad en los casos en que existe conflicto en las declaraciones de los testigos. Según muestra la experiencia, y de la misma naturaleza de las cosas, es mucho más probable que se haga justicia inclinándose muy pronunciadamente hacia la resolución inicial que tratando de considerar una cuestión discutida desde un punto de vista original. De aquí la regla de que no solamente debe existir una preponderancia de prueba en contra de tal resolución sino que la preponderancia debe ser clara. La significación de la palabra "clara" no siempre se aprecia enteramente. Claramente eso exige que la preponderancia sea tan aparente que manifiestamente se sobreponga a cualquier influencia legítima que pueda ejercerse en los jueces de aquellas ventajas en el descubrimiento de la verdad que el tribunal de apelación no puede tener. Eso ha sido indicado en muchas formas como puede verse en nuestras decisiones." *Ott* v. *Boring,* 139 Wis. 403, 406; 121 N. W. 126.

No emplearemos demasiado tiempo en considerar la alegada segunda causa de acción de la demanda relativa al traspaso hecho por del Moral a Vélez. Se presumiría que Vélez es un tercero hasta tanto aparezca claramente que el estado del registro o que los actos de del Moral y Castro, suponiendo que exista un fraude, eran conocidos por él. Creemos que no quedó establecido el hecho de que Vélez conoció todos los alegados actos de fraude de del Moral y Castro, suponiendo que existía una conspiración entre ellos, sin embargo, como la base principal de esta afirmación de la sentencia de la corte es la falta de prueba de la conspiración principal, Vélez, desde luego, tiene derecho al beneficio de las consideraciones por las cuales ambas cortes llegaron a tal conclusión.

Con lo dicho anteriormente se resuelve el error principal que ha sido alegado por la apelante. Sostiene también la apelante que la corte debió haber dictado sentencia sobre

las alegaciones. En primer lugar somos de opinión de que una moción para que se dicte sentencia basada en las alegaciones debe hacerse antes de que se llame el caso a juicio, por los mismos principios discutidos en el caso de *El Pueblo* v. *París,* 25 D. P. R. 111. Debe presumirse que si el demandante va a juicio sin promover la cuestión de la suficiencia de la contestación, ya mediante tal moción o por moción para eliminar, él está conforme con las cuestiones como han sido alegadas. Tal moción, en beneficio de la justicia, no debe hacerse a manera de sorpresa en el juicio. No encontramos que la contestación ya de del Moral o Castro o Vélez fueron lo suficientemente evasivas o que no contestaron las cuestiones alegadas a fin de justificar una sentencia basada en las alegaciones. Estos defectos que han sido alegados deben corregirse mediante moción en la que se solicite más especificación de particulares o algo equivalente a esto. De todos modos no vemos que la apelante fuera perjudicada por la acción tomada por la corte. Una sentencia sobre las alegaciones es por lo general más aplicable cuando resulta claro que el demandado ha equivocado su defensa.

El segundo y séptimo error pueden ser resueltos conjuntamente. Son, en cierto modo, del mismo tenor que las cuestiones que han sido consideradas en el primer error alegado. Ni la contestación de del Moral ni de Castro debían haber sido eliminadas como no hubiera sido por falta de un juramento y este defecto solamente es de aplicación a la contestación de del Moral y quedó subsanado por la resolución de la corte, permitiéndole formular una contestación. Como hemos visto al discutir el primer error, cualesquiera otras cuestiones relativas a deficiencias en la contestación deben corregirse mediante moción hecha ántes del juicio. Por tanto la prueba de los demandados era admisible de acuerdo con la cuestión debatida.

El tercer error queda resuelto con decir que la corte siempre tiene discreción para permitir que se enmiende una alegación, o hasta la misma sentencia. Una corte de apelación,

en general solamente revocaría por cierta privación o sorpresa ocurrida a un demandante. Es de presumirse que un demandado nunca se encuentra voluntariamente ante la corte y las cortes tienden a ser más liberales en el sentido de proporcionarle una oportunidad para defenderse. No creemos que la corte cometió error al no permitir a la apelante probar que la excepción previa original radicada por Castro fué firmada por el mismo notario que últimamente compareció a nombre de Justo Vélez. Ella no hubiera tendido a mostrar fraude o conspiración si todos los tres demandados hubieran comparecido por el mismo abogado. Discutimos una cuestión semejante en el caso de *Ayllón y Ojeda* v. *González y Fernández,* de (pág. 67). Ciertamente no hubo prejuicio.

El quinto, sexto y octavo señalamientos no eran importantes o perjudiciales.

En el noveno señalamiento, que es el que principalmente hemos discutido, la apelante también alega que la corte cometió error al dictar sentencia por costas, desembolsos y honorarios, pero no vemos que la corte cometiera abuso de discreción al conceder costas y honorarios. Cuando, de acuerdo con la ley, una persona tiene derecho a adquirir títulos por contribuciones, como sucede en Puerto Rico, un demandante que alega fraude y conspiración corre el riesgo de ser condenado en costas, de no probar estos hechos, y no podríamos decir que la corte cometió abuso de discreción al conceder los honorarios.

La apelante hizo un análisis acabado de la prueba que el apelado del Moral no refutó con otro análisis en oposición, de modo que la hábil insistencia de la apelante ha hecho recaer este trabajo de análisis en oposición sobre esta corte. Sucede muy frecuentemente que los apelados, al confiar en la corte inferior y en la supuesta corrección de su decisión, imponen una fuerte tarea sobre los jueces de esta corte.

La sentencia debe ser confirmada.

                         *Confirmada la sentencia apelada.*

Jueces concurrentes: Sres. Presidente Hernández y Asociados del Toro y Aldrey.

El Juez Asociado Sr. Hutchison firmó: "conforme con la sentencia."