BERNABÉ SABALIER SABALIER, demandante y apelado, v. SAN-
TIAGO IGLESIAS PANTÍN y EL BANCO DE SAN JUAN, deman-
dados y apelantes.

No. 3222.—*Visto:* Noviembre 14 y 15, 1924.  *Resuelto:* Junio 19, 1925.

1. CORPORACIONES—SUS FACULTADES Y RESPONSABILIDADES—ACCIONES CIVILES—
DEMANDA INSUFICIENTE—IMPUTACIÓN DE FRAUDE A LA CORPORACIÓN.—Una
demanda en que se imputa fraude a una corporación por actos de su presi-
dente no es suficiente cuando no alega que éste actuara dentro de los po-
deres de la corporación y dentro de los límites de su cargo.
2. PRINCIPAL Y AGENTE — DERECHOS, DEBERES Y RESPONSABILIDADES MUTUAS —
CUMPLIMIENTO DEL MANDATO—CAPACIDAD PARA COMPRAR·Y VENDER—COMPRA
PARA SÍ.—El artículo 1362, párrafo 2, del Código Civil no prohibe la compra
de bienes por una corporación por el hecho de ser accionista de la misma
el mandatario del vendedor.
3. FRAUDE—ACCIONES—EVIDENCIA INSUFICIENTE—PRUEBA DESACREDITADA.—Ana-
lizada la prueba del demandante relativa al fraude, *se resolvió* que era de
tal modo desacreditada que era imposible sostener la conclusión a que llegó
la corte inferior en ese extremo.
4. PRINCIPAL Y AGENTE—DERECHOS Y RESPONSABILIDADES RESPECTO A TERCERAS
PERSONAS—FACULTADES DEL MANDATARIO—FACULTADES LIMITADAS POR INS-
TRUCCIONES PRIVADAS.—Aunque las facultades de un mandatario pueden ser
limitadas por instrucciones privadas del mandante, tales instrucciones no afec-
tan a terceras personas que no tienen conocimiento de ellas.
5. TESTIGOS—CREDIBILIDAD, IMPUGNACIÓN, CONTRADICCIÓN Y CORROBORACIÓN—IN-
TERÉS Y PREJUICIOS DEL TESTIGO—INTERÉS DEL DEMANDADO.—La declaración
de un demandado, aunque interesada, debe creerse hasta tanto se presente
alguna razón legal o hechos que la destruyan; a falta de éstos, tiene derecho
al beneficio de cualquier teoría razonable compatible con la honradez.
6. CONTRATOS—NULIDAD—CONSENTIMIENTO OBTENIDO POR DOLO—REQUISITOS DE
LA PRUEBA.—El fraude, aunque demostrado por las circunstancias, no debe
presumirse; y el peso de la prueba incumbe a la parte que lo alega.
7. FRAUDE—ACCIONES—PRUEBA DE DOLO—CIRCUNSTANCIAS PRESUNTIVAS.—El juz-
gador no debe impresionarse por la denuncia de fraude al extremo de agrandar
la importancia de todo hecho sobre el que se pueda suscitar la sospecha de
haberse cometido, y desdeñar más lógicas deducciones compatibles con la
buena fe.

SENTENCIA de *Charles E. Foote,* J. (Primer Distrito, San Juan),
declarando con lugar la demanda, con costas, y sin lugar la con-
trademanda.  *Revocada* en cuanto declara con lugar la demanda,
y *confirmada* en cuanto a la contrademanda.

*Leopoldo Feliú, Bolívar Pagán, José Soto Rivera, R. Sancho Bonet
y Angel Arroyo Rivera,* abogados de los apelantes; *Francis H.
Dexter, R. Rivera Zayas y L. Abella Blanco,* abogados del apelado.

El Juez Asociado Señor Franco Soto, emitió la opinión del tribunal.

Este es un pleito iniciado por Bernabé Sabalier para declarar la nulidad de un contrato de compraventa de cierta propiedad inmueble denominada "Melilla," celebrado de una parte por Santiago Iglesias, actuando como apoderado del demandante, y El Banco de San Juan, representado por su presidente Abraham Peña.

El fundamento esencial de la demanda es el dolo o fraude que se imputa haberse cometido mediante simulaciones o falsas representaciones empleadas por Iglesias y El Banco de San Juan, actuando por éste su presidente Abraham Peña, obteniendo de este modo el consentimiento de Bernabé Sabalier para realizar el contrato.

Las palabras de la demanda refiriendo las simulaciones o falsas representaciones, dicen así:

"8. Que dicho Abraham Peña Romero y Santiago Iglesias Pantín, el primero actuando en su carácter de Presidente de la corporación 'El Banco de San Juan,' y el segundo por sí y además como apoderado general de D. Bernabé Sabalier Sabalier, a espaldas del demandante se pusieron de acuerdo, valiéndose de falsas y fraudulentas simulaciones se combinaron y confabularon entre sí para llevar a efecto la compraventa de la finca 'Melilla' arriba descrita de la propiedad del demandante, y engañando a éste con palabras y maquinaciones insidiosas, consiguieron del mismo que pusiera su firma al pie de una carta o documento privado en el cual se proponía la venta de dicha finca Melilla, haciéndole creer sin leerle ni permitirle leer dicho documento, que se refería a asuntos obreros de la American Federation of Labor, y el demandante, bajo tal creencia, confiando en la buena fe de su abogado Sr. Peña y de su apoderado Sr. Iglesias, suscribió dicho documento sin conocer su contenido e ignorando que se trataba de la venta y realización de sus bienes, y por esos medios engañosos dichos Sres. Peña e Iglesias consiguieron su consentimiento para dicha venta, realizándose la misma en escritura de fecha 22 de mayo de 1920 autorizada por el que fué notario de esta ciudad don Antonio Trujillo Guil bajo el número 40 de su protocolo."

Se sostuvo además como otras dos causas de acción, de

una parte, que Santiago Iglesias y su esposa eran accionistas del Banco de San Juan, y de otra, que esta corporación tenía cierta sociedad con otra corporación titulada "Corporación Editora de Justicia," de la que eran, respectivamente, presidente y secretario Santiago Iglesias y Abraham Peña.

Con estas últimas alegaciones se ha intentado incluir el caso en el párrafo 2º del artículo 1362 del Código Civil Revisado que prohibe a los mandatarios adquirir por sí ni por persona alguna intermedia, los bienes de cuya administración o enajenación estuviesen encargados.

Los demandados contestaron, no sin antes excepcionar la demanda por falta de causa de acción, y la corte inferior, después de desestimar la excepción y de un juicio laborioso y extenso que duró varias semanas, declaró la nulidad del contrato y ordenó la restitución de la finca al demandante, declarando a su vez sin lugar la contrademanda del demandado Iglesias, reclamando el valor de ciertos servicios como apoderado del demandante.

Los demandados apelaron y señalan, independientemente, numerosos errores en sus respectivos alegatos, pero en conjunto casi todos ellos coinciden en su esencia y todos pueden resumirse en tres grupos, a saber: 1º, haber desestimado la corte inferior la excepción de falta de causa de acción; 2º, los que se refieren a que fueron admitidas ciertas pruebas; y 3º, error en la apreciación de las pruebas y de la jurisprudencia y ley aplicables.

Se alega por los apelantes que la demanda no imputa fraude a la corporación "El Banco de San Juan," y que la prohibición del artículo 1362, párrafo 2º, *supra,* no tiene aplicación en este caso. Y por el banco se sostiene además que él es tercero.

[1] No existe más alegación en la demanda que mencione al Banco de San Juan en relación con el dolo, que la alegación 8 que hemos transcrito. En ella únicamente se imputa el fraude a dicha parte demandada, por actos de Abraham Peña, actuando como presidente de la corporación. La de-

manda aparece dirigida al Banco de San Juan como cuerpo
corporativo y según nuestra ley de corporaciones "los nego-
cios de toda corporación serán manejados por sus directo-
res. . . . ." Sección 11, tal como fué enmendada por la ley
No. 24, aprobada en abril 13 de 1916 (p. 70).

"Los directores son sólo los agentes de la corporación para lle-
var a cabo sus negocios y no son la corporación, y como directores
meramente no tienen una sombra de interés en la propiedad de la
corporación,   *   *   *  ; ellos son sólo las personas por conducto
de las cuales los poderes, negocios y bienes de la corporación han
de ser administrados y ejecutados: La autoridad de los directores
o síndicos es conferida a ellos como agentes y ellos sólo pueden obli-
gar a la corporación actuando conjuntamente como tal agente;
*   *   *   7 R.C.L. p. 439.

"Un director individual no tiene poder general para hacer con-
tratos a nombre de la corporación y no existe presunción alguna de
que un contrato que aparece haber sido hecho por tal director fué
autorizado por la corporación, aun cuando él sea dueño de una
mayoría de las acciones de la corporación." 7 R.C.L. p. 440.

Parece, pues, que estas consideraciones responden a la
creación *sui géneris* de toda corporación. Ella es un orga-
nismo artificial, indivisible, intangible, existente solamente
en contemplación a la ley, según ya definió el Presidente
Marshall en el célebre caso de *Dartmouth College* v. *Wood-
ward,* 4 Wheat. 518 U. S., 4 L. ed. 629, 659. Y por razón
de su apariencia intangible, todos sus actos han de realizarse
en su nombre corporativo por conducto de sus agentes, pero
siempre y cuando estén dentro de los poderes y fines de la
misma. Esta es una de las diferencias esenciales que la
distinguen de las demás sociedades ordinarias, en las que
sus miembros actúan como personas naturales y como agen-
tes unos de otros.

Por esto la regla general aplicable a las corporaciones
cuando se les imputa el fraude, se ha definido por las auto-
ridades en esta forma:

"Sujeta a alguna diferencia de opinión en los casos más anti-

guos en cuanto al determinado remedio disponible, está bien establecida la regla general que una corporación es responsable en la misma forma que una persona natural por el fraude de su mandatario cuando actúa dentro de los poderes de la corporación y dentro de los límites de su mandato." 14 C. J. p. 775, sec. 2845.

Basta la lectura de la demanda y especialmente de la alegación 8 en que se imputa el fraude a los demandados y se verá que aunque se alega que Abraham Peña actuaba como presidente del banco, no se expresa que lo hiciera dentro de la facultad o jurisdicción de la corporación, ni tampoco dentro del límite de su cargo.

La misma demanda en el hecho 6º alega los fines y objetos a que se dedica la corporación Banco de San Juan y no refiere entre sus facultades la de adquirir inmuebles.

Existen decisiones en sentido de que la autoridad del presidente de una corporación no puede presumirse como materia de ley y que como tal agente no tiene el poder inherente de comprar propiedades para la corporación. 7 R. C. L. 453.

Una doctrina parecida ya había sido sostenida por esta Corte Suprema en el caso de *Turner* v. *Registrador,* 22 D.P. R. 575, diciéndose:

"La regla general referente a esta cuestión no es susceptible de ser interpretada erróneamente. Los negocios de una corporación son casi universalmente administrados por una junta de su seno elegida por los accionistas. 10 Cyc. 787, nota 72. Es la junta directiva el mandatario, correspondiente al socio gestor de una sociedad. Por regla general ningún funcionario tiene a su cargo la administración o venta de la propiedad de una corporación por el mero hecho de ser tal funcionario, como sucede con el socio gestor de una sociedad de acuerdo con la misma ley. Se alega que como la junta está compuesta de sus directores de la cual el presidente de la corporación en casi todas partes es uno de ellos, que la prohibición que comprende a toda la junta comprende también a cada uno de. los miembros que la forman. En contestación a esto diremos que uno solo de los directores no puede ordenar la venta de la propiedad de la corporación sin el consentimiento de los demás directores. La agencia, la resolución que ha de prevalecer no ad-

quiere forma cabal sin la intervención de toda la junta la que generalmente se obtiene después de una reunión que ha sido convocada debidamente. También la venta de la propiedad de una corporación con frecuencia se lleva a cabo únicamente notificando a los accionistas. En el caso de una sociedad la voluntad del socio gestor prevalece en la sociedad como cuestión de derecho. Pero esto no ocurre en el caso del presidente de una corporación.''

El mero hecho, por tanto, de ser Abraham Peña presidente del Banco de San Juan, no es suficiente para hacer responsable a dicho banco por los actos individuales que ejecutara Peña en connivencia con el otro demandado Iglesias.

''Sin embargo, el presidente de una corporación cuando actúa a nombre de ella es meramente su agente y no puede actuar de modo de obligar a la corporación fuera del límite de sus facultades, y el hecho de que sea dueño de una mayoría de las acciones de la corporación por sí mismo no le da autoridad adicional alguna.'' 7 R.C.L. 450.

No queremos decir ni sería posible sostener, sin embargo, como sostiene uno de los apelantes, que la corporación tiene que haber adoptado el contrato y que además la adopción tiene que haberse hecho ''con conocimiento del fraude.'' Los casos de la cita que hace dicho apelante sostienen lo contrario en virtud de la regla *respondeat superior*. Esta doctrina se aplica a la responsabilidad de las corporaciones por los actos de sus agentes. *Henderson* v. *San Antonio etc. R. R. Co.,* (17 Tex. 560), 67 Am. Dec. 675–78. Para mejor ilustración en la materia, en dicho caso se hace a su vez la siguiente cita:

''Story, en su tratado sobre mandatos expresa como sigue la regla legal con respecto a la responsabilidad del mandante por la negligencia y actos torticeros o fraudulentos de sus mandatarios, tal como se deduce de los casos resueltos: 'Es una doctrina general de derecho que aunque el mandante no es ordinariamente responsable (pues a veces lo es) en un caso criminal por los actos o fechorías de su mandatario a menos que de hecho haya autorizado o cooperado en dichos actos o fechorías, sin embargo, está sujeto a res-

ponsabilidad hacia terceras personas en un pleito civil por los fraudes, engaños, ocultaciones, falsas representaciones, actos torticeros y negligentes y toda clase de fechorías y omisiones de deber cometidos por sus mandatarios en el curso de su empleo, aunque el mandante no hubiere autorizado o justificado o participado en o tenido conocimiento de tal mala conducta, ni aun cuando hubiere prohibido o desaprobado dichos actos. En todos esos casos se aplica la regla de *respondeat superior;* y ello se funda en razones de política pública y conveniencia; pues en ninguna otra forma podría haber seguridad alguna para terceras personas en sus negociaciones, ya directamente con el mandante o indirectamente con él por medio de la instrumentalidad de sus agentes. En todos dichos casos el mandante hace aparecer a su mandatario como capacitado y digno de confianza y por consiguiente en efecto garantiza su fidelidad y buena conducta en todos los asuntos dentro del alcance de su mandato:' Story on Agency, secs. 452, 127, 135, 137.''

Pero esta doctrina es aplicable tratándose de las corporaciones siempre y cuando el acto o contrato que verifique el agente esté dentro de la jurisdicción de la corporación y de las facultades o límites de la agencia, extremos que no han sido objeto de alegación en la demanda. En cuanto al límite de la agencia o mandato el Código Civil expresa de una manera clara la razón del principio, disponiendo:

''Art. 1619.—Cuando el mandatario obra en su propio nombre, el mandante no tiene acción contra las personas con quienes el mandatario ha contratado, ni éstas tampoco contra el mandante.

''En este caso el mandatario es el obligado directamente en favor de la persona con quien ha contratado, como si el asunto fuera personal suyo. Exceptúase el caso en que se trate de cosas propias del mandante.

''Lo dispuesto en este artículo se entiende sin perjuicio de las acciones entre mandante y mandatario.''

[2] De igual modo las demás alegaciones de la segunda y tercera causas de acción no son suficientes.

Se alega que Iglesias y su esposa eran accionistas del Banco de San Juan y que esta corporación a su vez tenía una sociedad con la corporación ''Editora de Justicia,'' de la que Iglesias y Peña eran presidente y secretario, respec-

tivamente.   El punto envuelto es el siguiente: siendo mandatario Iglesias de Sabalier, y Peña abogado de éste y agente vendedor y comprador, ellos compraron para sí con la venta a favor del banco.

En este punto este mismo tribunal en el caso de *Turner v. El Registrador, supra,* ha establecido una diferencia entre las sociedades y las corporaciones y declara que el presidente de una corporación no está comprendido en la prohibición del artículo 1362, *supra.*

La misma doctrina fué ratificada más tarde en el caso de *Rosenstadt & Waller,* v. *Registrador,* 23 D.P.R. 290–91.

La razón de esta jurisprudencia es porque una corporación, como creación artificial de la ley, es distinta de sus miembros o accionistas.   La individualidad de éstos desaparece y es absorbida por el capital social y ellos no son ni privada ni conjuntamente dueños de su propiedad.   Se ha llegado a decir por las autoridades que ni una parte ni todas las personas naturales que componen una corporación o quienes sean dueños del capital social o controlen sus negocios, son la corporación misma y si un solo individuo forma una corporación, él mismo no es la corporación: en tales casos el hombre es una persona y la corporación es otra.   *Exchange Bank of Macon* v. *Macon Const. Co.,* 97 Ga. 1, 25 S. E. 326, 33 L.R.A. 800.

La demanda, por tanto, no es suficiente en ninguna de sus tres causas de acción y la corte inferior cometió error al no sostener la excepción de los demandados.

II. La prueba tampoco es suficiente para sostener la demanda ni las conclusiones a que llegó la corte inferior en su opinión.

Al examinar los méritos de la prueba consideraremos incidentalmente los errores que se refieren a la admisión de cierta evidencia y así serán discutidos los errores del 2⁹ y 3er. grupo conjuntamente y a medida que el orden en la discusión de las materias lo exija, aunque podemos anticipar que dada la regla general de latitud seguida en la admisión

de las pruebas en casos de fraude, por razón que a su vez la jurisprudencia es unánime en exigir en tales casos una prueba robusta, clara y convincente, las objeciones de los demandados carecen de importancia, pues su objeción se refiere al peso o valor probatorio de las mismas, más bien que a su impertinencia.

[3] (*a*) No obstante el cúmulo de detalles y circunstancias que se ha tratado de probar en este caso como una red tejida por los demandados con el propósito, según se alega, de envolver al demandante y engañarle para defraudar sus intereses, lo cierto es que toda la cuestión fundamental parece girar alrededor del documento letra J, que aparece otorgado el 30 de abril de 1920.

Este documento, literalmente, dice:

"Compañía Editora de 'Justicia.'— Capital autorizado $30,000. &&—Abril 30, 1920.—Memorándum para don Bernabé Sabalier.— Tenemos el ofrecimiento de hacer una gran operación para la venta de los solares y por medio del Banco de San Juan a un precio posiblemente mayor de veinte mil dollars ($20,000). Al mismo tiempo, las hipotecas pendientes en el Banco Popular serán pagadas de esta suma.—El Banco de San Juan nos pagará sobre créditos hipotecarios el 6% de interés anual, abonando los plazos mensualmente.— Según se vayan cobrando los pagarés que serán de $3,000 cada uno, se edificarán casas de concreto al objeto de obtener rentas.—Esta operación económica conviene hacerla, y sobre todo en vista de la necesidad de salvarnos de los aumentos de las contribuciones, en el pago de los intereses al Banco Popular y en las reformas que ha de sufrir esta parte de Santurce cuando el Municipio y el Gobierno Insular hagan las reformas del barrio de Melilla después de la construcción de las carreteras y del alcantarillado.—Como nosotros no vamos a aumentar el precio de los alquileres ni hacer negocios difíciles con los pobres que en su mayoría habitan estos solares creemos conveniente que una empresa financiera acometa ese plan. Esto es mejor que vender solares individualmente y a bajos precios.—La casa donde vive Bernabé Sabalier será reedificada a un costo de mil dollars o más.—Los intereses que paga el Banco darán suficiente suma para las necesidades de la vida de Bernabé Sabalier.—Estamos conformes.—(Firmado) Bernabé Sabalier.—Santiago Iglesias."

El demandante reconoce haber firmado ese documento, pero sostiene que fué inducido a hacerlo por Santiago Iglesias y Abraham Peña, este último actuando como presidente del Banco de San Juan, haciéndole creer, sin leer ni permitirle que leyera dicho documento, que se refería a asuntos de la American Federation of Labor.

Los pasajes más salientes de los testimonios de cinco testigos que declararon a ese fin, son como siguen:

El propio demandante dice:

"En el mes de enero de este año, me pasaron a mí dos cosas particulares: la primera fué un documento que me llevó sólo para que yo lo firmara, que estaba en letra de maquinilla; ese documento yo no lo leí, no me dejaba leerlo. * * * Respecto a ese documento Iglesias me dijo que era para los fondos de la Internacional. * * * Yo lo firmé, lo firmé porque llegó y me puso el papel. Yo sé que estaba escrito en maquinilla, y por la confianza que tenía en él lo firmé; * * * "

"Lo que dijo con respecto a los unionistas que oí, eso fué como a los 6 días que llegó y entonces le dije: 'Por Dios, ya estoy cansado de firmar papeles' y dice: esto es de necesidad porque el Partido Unionista ha de entrar en el gobierno el día primero y hay que asegurar esa finca porque esa finca no está segura; me puso a firmar pero ya estaba cansado de firmas y no podía con los brazos porque me da calambre, y dije: 'Goyo, ven acá firma ahí a mi ruego,' y me dijo usted (dirigiéndose al Sr. Iglesias) que no, que no y me cogió la mano y empezó a hacerme firmar. Esa es la verdad ante ese Dios Supremo."

"Allí estaba Peña con Don Santiago Iglesias; ellos andaban juntos siempre. Después que lo firmé, yo observé que cuando salió le dijo: 'Qué tal, cayó? Así ha sido.' "

"Cuando Iglesias salió de recoger la firma Abraham subía de abajo para arriba. Yo estaba todavía en calzoncillos y no iba a salir en calzoncillos afuera. Lo que sí oí cuando le dijo Peña: 'Cayó?, y él le dijo: 'Sí.' No sé si Peña se lo dijo en voz baja, sé que lo oí. Eso fué en enero de este año."

"lo que le dijo (Peña a Iglesias) * * * en el balcón o afuera, la cosa es que no estaba junto conmigo e Iglesias; estaba fuera; no sé si era en el balcón que estaba Peña; estaba afuera."

"Puedo recordar que ese documento se firmó en enero de este

año, porque lo llevó a casa y yo lo vi. Me dijo (refiriéndose a Iglesias) que era para la Internacional. . . . .''

''Este papel que se me pone de manifiesto marcado letra J. Esa firma que está ahí también es mía.''

Gregorio Torres, hijo de crianza del demandante, dijo:

''Una mañana fué el Sr. Iglesias y el Sr. Abraham Peña en un automóvil con un documento para que se lo firmara, que tenía que asegurar el porvenir de su finca, porque si no lo aseguraba iba a subir el Partido Unionista y lo dejarían en las tablas, y vino mi padre (*sic*) y me llamó a mí para que le firmara el documento ese y el Sr. Iglesias se negó que yo firmara  *  *  *.

''No me dejaron leer el documento, nada en absoluto; porque no quiso el Sr. Iglesias que yo mirara el documento ni el viejo tampoco.  *  *  * ''

''lo que ocurrió fué, que después que mi padre (*sic*) llegó y firmó el Sr. Iglesias cogió y envolvió su escrito y se tiró abajo y le seguía el Sr. Abraham Peña y le dice: Qué hay de eso? Y dice el Sr. Iglesias: 'Cayó.' ''

Después dice el mismo testigo:

''No sé si Abraham Peña le preguntó algo a Iglesias; como ellos se marcharon.''

Antonia Encina: esta testigo dice que estuvo presente cuando Iglesias le llevó a Sabalier a firmar un papel y que lo único que oyó decir es ''firma los papeles, que le conviene'' y que ella se marchó.

Justo Quiñones tenía un establecimiento frente a la casa de Sabalier y dice que una mañana, estando él en la acera de su tienda, vió venir a Iglesias y a Peña en un automóvil; que Iglesias entró y Peña se quedó en el automóvil, luego salió y se acercó a la casa cuando Iglesias salía y preguntándole Peña si había conseguido que firmara, contestó Iglesias: Cayó! Dice que fué tan fuerte la voz de Iglesias y Peña que pudo oir.

Este testigo declara por otro lado que tuvo diferencias con Iglesias por haberse opuesto éste a que obtuviera un solar en la finca ''Melilla'' objeto del pleito.

Arcadio Saldaña dice lo mismo que el anterior, pero a la palabra "cayó" añade otra que afirma se dijo, pero siendo de carácter soez e indecente no es necesario repetir.

Esta es toda la prueba directa con la que se tiende a establecer el dolo.

Si la teoría del fraude requiere una prueba fuerte y satisfactoria, que no deje dudas en el ánimo del juzgador, estamos obligados a decir que tal prueba no reúne esas condiciones.

Sabalier era sordo y no podía oír una conversación en voz baja. El se queja que una de las cosas que se le había prometido y no se había cumplido era la de no haber conseguido un aparato que le ayudara a corregir el defecto de su sordera, y a pesar de que Gregorio Torres afirmó categóricamente que Iglesias y Peña hablaron en voz baja y en tal tono se pronunció la palabra "cayó," él oye, sin embargo, distintamente esta frase *ad hoc* que significaría por sí todo el propósito infernal y fraudulento de Iglesias y Peña.

Tampoco Sabalier y Torres están de acuerdo en cuanto al motivo que se alega en la demanda para que Sabalier firmara el documento y las representaciones deben probarse sustancialmente como se alegan. 27 C.J. p. 40, sec. 165.

La testigo Encina, testigo presencial, en nada confirma las simulaciones que Sabalier y Torres declaran haberse empleado para obtener el consentimiento del primero y ella por el contrario implícitamente niega que los hechos ocurrieran en la forma que ellos relatan.

Asimismo ningún peso pueden tener las declaraciones de los dos restantes testigos Quiñones y Saldaña. Estos testigos tanto quieren decir que más bien impugnaron las declaraciones del propio interesado, el demandante, y la de Torres, cuando afirman que fué tan fuerte el tono de la conversación que podía haberse oído en el sitio que ellos se encontraban. Es natural, estos testigos estaban distantes, estaban en la acera opuesta, y sólo hablando fuerte es como podían oir, pero Gregorio Torres, que estaba en la casa de Saba-

lier y junto a Iglesias y Peña, manifiesta que éstos conversaban en voz baja y contradice de este modo las manifestaciones de aquellos testigos, quienes tampoco están de acuerdo acerca de las mismas palabras pronunciadas por Iglesias al contestar a Peña. El fraude, además, participa del carácter de un delito y como tal y por el fin que persigue busca la sombra para perpetrarse y la declaración de estos testigos equivalía a decir que Iglesias y Peña realizaron su crimen públicamente, en pleno día, sin temor a enterar a todo el mundo de la confabulación y medios dolosos empleados para engañar al demandante y obtener su consentimiento para la venta.

Hay además cierta circunstancia que hace sospechosas esas declaraciones. Nos referimos a la época en que primeramente Sabalier, y luego Gregorio Torres, dijeron que se firmó el documento. Este lleva fecha 30 de abril de 1920. El 22 de mayo de 1920 fué que se otorgó al banco la escritura de venta. Parecía decisivo a la contención del demandante hacer resaltar que aquel documento que precedió a la venta era, no obstante, posterior a ella, y Sabalier declaró repetidas veces en la primera parte de su declaración que dicho documento se firmó en enero de 1921. Se probó, sin embargo, con la declaración de Ramón A. Nadal, agente de la New York & Portó Rico Steamship Co., que el 29 de diciembre de 1920 Santiago Iglesias había embarcado hacia los Estados y no regresó hasta el mes de marzo del mismo año. Sabalier, luego que la corte inferior tomó un receso por unos tres o cuatro días, rectificó la fecha, pero la declaración de Gregorio Torres en ese punto quedó en pie y asimismo se había fijado en cierto documento de queja que aparece firmado por el mismo Torres a nombre de Sabalier, dirigido al Gobernador de Puerto Rico, denunciando los hechos de este caso.

¿Es ésta, pues la prueba robusta, clara y satisfactoria a que se refiere la jurisprudencia?

Consideramos de tal modo desacreditada la prueba de

los testigos que hemos examinado, que no es posible soste-
ner la conclusión a que llegó la corte inferior en ese ex-
tremo y con igual razón podríamos repetir para este caso el
mismo razonamiento que aplicó esta Corte Suprema al de
*Gordils* v. *Sucs. de Frontera,* 21 D.P.R. 227, 230. En él se
pedía la nulidad de un poder y de una hipoteca, fundándose
la demanda en que el poder fué suscrito por la poderdante
en virtud de una maquinación dolosa del apoderado en con-
fabulación con una sociedad mercantil. Y esta corte des-
pués de examinar la prueba que, realmente en ciertos parti-
culares resulta análoga a la de este pleito, declara:

"Nos parece que esa prueba no es suficiente para que se pueda
llegar a la conclusión de que el documento de poder se otorgó me-
diante fraude y engaño. La prueba del fraude debe ser siempre
robusta y las declaraciones de esos dos testigos y la propia mani-
festación de la demandante Romana Gordils no nos demuestran que
al suscribir ella el documento no supiera que firmaba un poder a
favor de Vázquez Caraballo, pues no es bastante para ello lo que
manifiestan los testigos Rivera y Torrellas, por lo que no podemos
estar conformes con la parte de la sentencia que declara la nuli-
dad de ese documento por fraude."

De igual modo podíamos decir lo mismo en cuanto al ca-
rácter de la prueba testifical que se ha presentado en este
caso, lo que se dijo por esta corte en el de *Martínez* v. *Ro-
dríguez,* 26 D.P.R. 11, tratándose de anular un testamento
por fraude en su otorgamiento:

"Si las escrituras concernientes a bienes reales o renuncia de
derechos pudiesen posteriormente anularse con prueba testifical de
la naturaleza de la que en este caso se ha presentado, el número de
impugnaciones que pudiera hacerse contra las escrituras notariales
sería ilimitado y la adquisición de propiedades quedaría sin segu-
ridad. La doctrina legal sostiene todo lo contrario. Razonamien-
tos semejantes aplicables al presente caso se han hecho en los casos
de *Cruz* v. *López,* 17 D.P.R. 43, y de *Torres* v. *Lothrop, Luce &
Company,* 16 D.P.R. 181; 231 U.S. 171. (58 L. ed. 172.)"

[4] (*b*). Era superfluo, sin embargo, por lo menos res-

pecto al Banco de San Juan, que Sabalier firmara o no el documento privado que ataca como fraudulento. El había otorgado ante el notario José E. Benedicto un poder a Iglesias que contenía cláusula bastante para la enajenación de inmuebles. Se alega, sin embargo, en la demanda que estas facultades del mandatario estaban limitadas por instrucciones privadas del mandante y en conexión con este punto se trató de probar además la forma en que se originó el poder, o sea, que se obtuvo a incitación del mandatario por la influencia de sus ideas personales en materias sociales mediante las cuales se había ganado la confianza del demandante, llegando a tener sobre él un gran ascendiente o un fuerte poder sugestivo. Este es el primer indicio de suspicacia o eslabón sospechoso de la cadena de presunciones sobre las que se ha levantado todo el edificio de este asunto. El mismo Sabalier expone sus relaciones personales con Iglesias desde hace más de veinte años; fué su asociado en la comunión de unas mismas ideas y no vemos que de tales relaciones, por íntimas que pudieran ser, o comunidad de ideas, pueda derivarse alguna consecuencia fraudulenta. En el caso de la *Ana María Sugar Co. v. Castro,* 28 D.P.R. 241, se toca ese punto y se dijo:

"Los apelados, y especialmente Castro y del Moral, eran íntimos amigos. De esto no hay duda alguna, pero ni la amistad ni el parentesco son por sí suficientes para probar fraude o conspiración."

En pugna con el carácter nada más que sospechoso de esa contención del demandante, hubo la prueba documental, que no fué impugnada por dicho demandante. Primero la carta de Sabalier a Iglesias de septiempre 16, 1916, invitándole a recibir el poder, y luego el poder mismo otorgado solemnemente como acto personalísimo ante el notario José E. Benedicto y cuya legitimidad y otorgamiento está admitido por el propio demandante.

Además, ni de la demanda se desprende ni tampoco de la prueba nada aparece que las instrucciones privadas que

alega el demandante haber dado a su apoderado limitando sus facultades en cuanto a la venta de bienes, fueran conocidas por el Banco de San Juan, y para este demandado carecía, por consiguiente, de importancia si Sabalier en realidad habría dado tales instrucciones. Esta es cuestión que había resuelto hace años esta Corte Suprema en el caso de *Finlay* v. *Finlay,* 8 D.P.R. 409, diciéndose lo siguiente:

"11. Considerando: que el convenio celebrado por el apoderado obliga al poderdante y es cuestión baldía en pleito que sobre él se promueva si aquél se excedió o nó de las facultades que le daba el poder cuando de éste no aparece limitación de facultades  *  *  * "

Y asimismo las demás autoridades americanas sostienen:

"Aunque en cuanto al mandante y mandatario el límite de la facultad de este último es aquella autoridad que realmente se le confiere por su mandante, que puede ser limitada por instrucciones y restricciones privadas, tales instrucciones y restricciones no afectan a terceras personas que no tienen conocimiento de ellas;  *  *  * ." 2 C. J. 570.

(*c*) No se nos oculta, sin embargo, que la tentativa de la prueba para conseguir el poder se. presenta en relación con otros incidentes tendentes a demostrar el desarrollo de medios inteligentes para preparar y forjar la idea del fraude. Por ejemplo, la edad provecta del demandante, que aparece con 90 años al otorgar el poder, y la conclusión de la corte inferior en este punto es que, por razón de la edad, Sabalier tenía debilitadas sus facultades mentales. Quiso decirse, pues, que Iglesias pudo apoderarse a su vez y anular la voluntad de Sabalier. Todos sabemos que llega un momento en nuestra vida que el progreso de la edad lleva consigo una disminución de nuestras energías y facultades cerebrales. Describimos una parábola y después de ascender descendemos. En este descenso senil es triste verdad que las funciones cerebrales se debilitan, los sentidos se embotan y por la falta de su buen funcionamiento fisiológico ellos van rompiendo poco a poco los lazos que nos ligaban al placer de

vivir. Y si bien de esta ley inexorable nadie puede sustraerse, es lo cierto, sin embargo, que muchos seres humanos, a la edad avanzada de Sabalier, conservan con claro y aparente vigor sus facultades mentales y si no todos, algunos de sus sentidos. Y esto ocurre con el mismo Sabalier. Es admirable la viveza de inteligencia con que expone su extenso testimonio en el juicio y sorprende asimismo la habilidad que tuvo para defenderse en el período fuerte de repreguntas. El tuvo el cuidado, después de afirmar categóricamente que había suscrito el documento letra "J" el 21 de enero de 1921, de rectificar esta fecha, como se ha dicho antes; tiene cuidado al ser preguntado por un abogado de los apelantes, quien le presentó a la vez dos documentos inquiriendo cuál de ellos fué el que firmó el declarante a instancias de Iglesias para la Internacional, manifestar que se lo presentasen al día siguiente que entonces contestaría, y para demostrar por último la integridad del poder de su vista, al mismo abogado contesta: "Yo puedo ver bien; ¿quiere enseñarme un saco de onzas?" "Recuerdo mi firma, puedo verla." Pero de cualquier modo la capacidad de Sabalier no fué puesta en *issue* y nada se ha demostrado que él no estuviera en el goce y plenitud de sus facultades mentales.

.(*d*) Al siguiente día de otorgado el poder, Sabalier hace testamento instituyendo herederos, entre otras personas, a los hijos de Santiago Iglesias. El testamento, así como la escritura de poder, se presentaron originàles con la oposición de los demandados.

Parece que esta prueba tuvo un doble objeto: 1º, levantar la presunción del poder sugestivo de Iglesias sobre Sabalier instituyendo éste herederos a sus hijos en parte de sus bienes; y 2º, demostrar la intervención de Peña, a quien se atribuye la redacción original de tales documentos. No obstante la oposición de los apelantes a la admisión de esta prueba, nos sentimos obligados a decir que su efecto es contraproducente al demandante. El testamento es un acto

personalísimo, así como el poder.   El notario José E. Bene-
dicto refirió que uno y otro documento fueron otorgados
ánte él y que el mismo día que otorgó el poder se le dieron
los datos, estando presente Sabalier, para el testamento que
firmó al día siguiente.   Es interesante notar, sin embargo,
que Sabalier en su declaración no sabe si firmó el testamento,
y más bien lo niega cuando dice: ''El me habló de un testa-
mento (refiriéndose a Iglesias) y que para su familia, y yo
le dije que no, que no iba a despojar mi familia para favo-
recer la familia de él,   *   *   * '' etc.   Con este incidente se
pone en tela de juicio la fe del notario, pero sin que tampoco
esté en controversia la confección de tal documento; la
fama y reputación del notario Benedicto está fuera del al-
cance de toda duda y sólo se ha conseguido con dicha prueba
afectar una vez más la veracidad del demandante en este
pleito.

Es bueno hacer notar en relación con esta prueba que la
corte inferior al referirse al testamento y con el objeto sin
duda de establecer mejor la intervención de líderes obreros
en los actos de la confabulación, incurre en el grave error
de declarar probado que Prudencio Rivera Martínez y Ra-
fael Alonso figuran entre los testigos del testamento cuando
la realidad es que ninguno de estos testigos lo fué de tal
instrumento, siendo dichos testigos Angel Rolán, José Fer-
nández Pérez y Leoncio Figueroa.

(*e*) Otra circunstancia en que se funda el demandante
para alegar el fraude es el precio de $26,877 que se fijó para
la venta, inferior en más de la mitad del valor real de la
finca.

Como cuestión general no hay presunción de fraude por-
que se haya dado un precio menor del que tuviera en el mer-
cado.   Si se llegara a esta conclusión, rara sería la venta
que no pudiera atacarse de fraudulenta.   Desde luego que
si apareciera de algún modo que la diferencia entre el pre-
cio pagado y el que realmente valía la finca fué recibido por
los demandados, la existencia del fraude era evidente, pero

directa o indirectamente nada se ha demostrado en ese particular, pues aun refiriéndonos a la época en que se verificó la venta, año de 1920, a lo que realmente estaba en posesión Sabalier de la finca y al valor en que estaba tasada ($9,070) para el pago de contribuciones, ni siquiera podía afirmarse que el precio era inadecuado. En 1920 la finca "Melilla" no estaba urbanizada; el valor por metro cuadrado fluctuaba, según peritos, de 50 centavos a $3, según el sitio, y la cabida, aunque aparece del título con 98,000 metros, Sabalier, sin embargo, solamente disfrutaba de la posesión material de una tercera parte de ella, tal vez menos. Una parte de la finca la reclamaba El Pueblo de Puerto Rico y en cuanto a la certeza de esta reclamación los autos dicen lo siguiente:

"Lcdo. del demandado al testigo: ¿Cómo reclamaba eso El Pueblo de Puerto Rico? Testigo: En primer lugar lo reclama ahora mismo, cuando querían hacer casas no dejándolas hacer. . . . .

"Demandante: Me opongo a la pregunta y solicito que se elimine la contestación por no ser esa la manera de probar ese extremo. Que traiga al Pueblo de Puerto Rico para demostrar cómo reclama eso, o qué título tiene El Pueblo de Puerto Rico, pero por la simple manifestación del testigo no podemos probar el título que tiene El Pueblo de Puerto Rico. El hecho en sí es que la finca pertenece al Sr. Sabalier, y mientras no haya una sentencia firme seguirá siendo.

"Juez: Sin lugar la objeción. El testigo dice que a virtud de una reclamación de El Pueblo de Puerto Rico eso estaba en pleito y por tanto no estaba bajo su control, y la corte puede añadir que no hay mucho tiempo se discutió un *injunction* por esto mismo. Puede continuar."

[5] Todas estas circunstancias parece que se tuvieron en cuenta para realizar la transacción y se hace innecesario que tengamos que penetrar en todas las posibilidades de los móviles o intención que tuvo Iglesias, pues su declaración, aunque interesada, debe ser creída hasta que se presentara alguna razón legal o hechos que la destruyeran, y no siendo así tiene el derecho, por lo mismo que el fraude no se pre-

sume, al beneficio de cualquier teoría razonable que sea compatible con la honradez. *Ana María Sugar Co.* v. *Castro, supra,* págs. 258, 259.

Quizá las ideas así como los móviles de Iglesias en el negocio fueron equivocados. Es más que probable, sin embargo, que la mayor parte de los vendedores que se desprendieron de sus propiedades en San Juan hace cinco o diez años lo hacían a sabiendas de que el valor de la propiedad territorial en San Juan seguiría aumentando. Aunque se atienda al futuro, éste es un dato aleatorio de alza o baja en los negocios y no es posible deducir de esta circunstancia ningún indicio para fundar el fraude.

(*f*) Se alegó en la demanda que después de firmado el documento letra "J", Iglesias y Peña nunca informaron a Sabalier de la venta de su finca, quien tuvo conocimiento real y verdadero de la misma el día 28 de junio de 1921, o sea, 16 días antes de iniciarse este pleito.

La prueba, sin embargo, por boca del mismo Sabalier demostró otra cosa diferente. Primero dijo que la supo por los carpinteros que construyeron su casa, la que se fabricó con el producto de la venta y durante el año de 1920; después dice que lo supo por el cobrador de las fincas del banco y en el período de las repreguntas declaró:

"Yo he dicho al Sr. Abella que yo supe de la venta de mi finca, primero por una muchacha llamada Josefa Verdejo . . . . de este año no puede ser, era en el año 20."

Pero dejando a un lado las diferentes fuentes de donde Sabalier dice que supo la realización de la venta, existe prueba documental que no ha sido contradicha que Sabalier tuvo tal conocimiento antes y después de otorgarse la escritura de venta de la finca "Melilla." El documento dice así:

"Situación de las propiedades de don Bernabé Sabalier en diciembre 19, 1920.—En abril 30, 1920, tuvimos el ofrecimiento procedente del Banco de San Juan, de hacer una operación para la

venta total de los solares por un precio posiblemente mayor de
$20,000.00, y de acuerdo con el procedimiento vendimos al Banco
de San Juan, bajo las condiciones específicas de que dicho banco
nos pagaría sobre créditos hipotecarios al 6 por ciento anual de
interés, pagado mensualmente. Los pagarés serían de $3,000.00
cada uno.

"Esta operación económica nos convino realizarla y sobre todo
fué más necesaria y perentoria para salvarnos de los aumentos con-
tributivos, las crisis de los alquileres, el déficit de nuestros ingresos
sobre nuestros egresos, y la imposibilidad de aumentar el precio de
los alquileres a los pobres que en su mayoría habitaban los solares,
y muchos de ellos debían sus mensualidades por más de un año.
Por otra parte era imposible hacer por nosotros un negocio de es-
peculación sobre la pobreza del inquilinato en las propiedades de
Melilla. Además la vivienda de mi representado Bernabé Sabalier
era necesario que fuera reedificada, y los intereses que paga el
Banco mensualmente son suficientes para mantener la pensión de
vida económica de mi representado y además tener recursos suficien-
tes para hacer los gastos extraordinarios y compromisos personales
que él tenga. Uno de los motivos importantes de la operación de
venta fué la deuda contraída por $4,000.00 con el Banco Popular
el que nos llevaba de intereses mensualmente $40.00.

"El estado de las propiedades después del pago de la hipoteca
al Banco Popular y de los honorarios legales de nuestro abogado por
los servicios prestados en los últimos años y los que pueda prestar
en el futuro ha quedado en las condiciones siguientes:

"Pagaré que vence en todo el mes de Junio de 1921_ $3000.00
"Pagaré que vence en todo el mes de Junio de 1922_ 3000.00
"Pagaré que vence en todo el mes de Junio de 1923_ 3000.00
"Pagaré que vence en todo el mes de Junio de 1924_ 3000.00
"Pagaré que vence en todo el mes de Junio de 1925_ 3000.00
"Pagaré que vence én todo el mes de Junio de 1926_ 2375.00
"Cien acciones del Banco de San Juan_____ 500.00
"Cinco acciones de la Compañía Editora de Justicia_ 50.00
"Diez bonos del Templo del Trabajo _____ 100.00
"Solar y casa en donde habita Don Bernabé Sabalier _____
"Valor que tendrá al ser construída de nuevo_____ 3000.00
"Valor de sus propiedades efectivas al terminar el
    año de 1920 _____ 20525.00

"En vista de la sugestión de mi representado Bernabé Sabalier
para adquirir en el día de hoy la cantidad de $1,200, y con el ob-
jeto de reedificar totalmente la casa que él habita, cercar el solar y
poner en condiciones completamente de acuerdo con las necesida-

des y para su salud y comfort, he hecho una operación con la firma Sucrs. de A. Mayol y Cía., para obtener materiales y asimismo con los Sres. Bolívar y Aboy Vidal, y para estos gastos he dispuesto de acuerdo con mi representado Sr. Sabalier, del crédito hipotecario que vence en junio de 1921, por el valor de $3,000.00 y de ellos le entrego al Señor Sabalier $1,200, dejando el resto para cubrir lo que se gaste en la construcción de la casa y hasta donde alcance; y para conocimiento de mi representado Señor Sabalier hago esta explicación sin perjuicio de hacerla más exacta en cualquier tiempo. En el día de hoy el Sr. Bernabé Sabalier ha leído esta explicación con la cual está conforme.

"(fdo.)  Bernabé Sabalier.
"(fdo.)  Santiago Iglesias."

Sabalier reconoció su firma en este documento, el que implica por otra parte un reconocimiento de la venta. Nada encontramos en el récord que arroje la más leve sombra en el otorgamiento del mismo, ni que en él Sabalier hubiera estampado su firma mediante algún medio ilegal o fraudulento.

La prueba ofrece otras consideraciones que nos parece innecesario examinar en virtud de las premisas que se dejan sentadas.

Sin embargo, basta decir ligeramente que la testigo Antonia Fernández juega un papel muy importante en este pleito. Ella, hermana de Sabalier (sic), sustituye a Iglesias; ella recibe el poder y se le instituye heredera poco antes de iniciarse el pleito. Basta referir de su declaración que siendo dueña de una casita sita en terrenos de la finca "Melilla," pagaba al banco después de la escritura de venta, alquileres por el uso del terreno. Ella leía los recibos que mensualmente le pasaba el banco y a la pregunta: "¿Qué decía el recibo, que el banco tenía arrenda la finca?," contesta: "Yo me refiero a las manifestaciones del administrador que es el Sr. Iglesias."

[6 y 7] Además, dado el número de circunstancias nada más que presuntivas que se desprenden de la prueba en cuanto a la comisión del dolo y para que podamos ver que reconocidas autoridades han advertido el riesgo que se co-

rre en hombres, jurados y jueces, dejándonos llevar del
vuelo de nuestra imaginación en materia de fraude, parece
oportuno citar del texto de Moore sobre Hechos, transcritos en el caso de *Calzado* v. *Carrero*, 15 D.P.R. 370, en opinión emitida por el Juez MacLeary, como ilustrativo y valioso para el presente caso, lo que sigue:

"En un caso en que se atacaba un testamento fundándose en
que había sido forjado, pero en el que el jurado emitió un veredicto a favor del testamento, el Juez Señor Crier se dirigió al jurado en los términos siguientes: 'Deben ustedes tener en cuenta de
que el peso de la prueba incumbe a la parte que alega el fraude.
Que el fraude, aunque demostrado por las circunstancias, no debe
nunca presumirse, pues el fraude es un crimen. No basta con descubrir circunstancias sospechosas. La sospecha no es evidencia. No
se necesita mucha ingeniosidad para hacer recaer sospechas de haberse cometido fraude en cualquier transacción comercial. Hay un
error muy grande y muchas veces ofensivo en que tienden a caer,
no solamente la opinión pública, sino también jurados y jueces; y
que conduce a formar juicios falsos y algunas veces a causar gran
tiranía. Por consiguiente, he de llamar especialmente la atención
del jurado sobre él y advertirles que deben precaverse contra el
mismo. Y es éste. La ley aborrece el fraude. Toda conciencia
honrada lo detesta, y aun aquellos mismos que lo practican toman
parte en denunciarlo. Los hace virtuosos por el momento, y son
los primeros, por los argumentos de la conciencia, y juzgando a los
demás por ellos mismos, en creer en su existencia y en declamar
bien alto contra él. Cuando se alza en una comunidad el grito de
fraude o cuando un abogado lo denuncia con convicción ante un
tribunal, nos inclinamos a ver todos los hechos a través de un
prisma falso que agranda la importancia de todo hecho sobre el que
se pueda suscitar la sospecha de haberse cometido fraude, y desdeña
las más claras deducciones en su contra. En medio de nuestra virtuosa indignación contra el fraude primero suponemos que se ha
cometido, y luego buscamos argumentos para confirmar, no nuestros
argumentos y sí nuestros prejuicios. 'Bagatelas tan ligeras como el
aire,' se convierten entonces en 'verdades de la Santa Escritura.'
Circunstancias que para el ánimo que no está predispuesto en contra son tan compatibles con la inocencia como con la culpabilidad,
que a lo más solamente podrían suscitar sospechas, se mencionan
como prueba concluyente del crimen. Aquellos que juzgan sobre

los derechos de los hombres, bien como jueces, bien como jurados, deben precaverse contra esta debilidad natural a la que casi todos estamos sujetos. Nos imaginamos ser más sagaces de lo que quizás se nos cree. Este sentimiento, es halagado por lo que nosotros creemos ser penetración superior. El pícaro podrá ser listo, pero lo que es a nosotros no nos engaña. Confiados en esta creencia nos hacemos demasiado astutos, y con frecuencia vemos lo que no existe. Permitimos que nuestra imaginación le usurpe las riendas a nuestro juicio, y nos lanzamos precipitadamente a caza de la zorra llamada fraude. Las circunstancias que deben servir de prueba para demostrar el fraude son solamente aquellas que sean incompatibles con una opinión contraria de la transacción y que irresistiblemente nos lleven a esa conclusión.''

Solamente resta decir que la contrademanda del demandado Iglesias reclamando el valor de sus servicios como apoderado y administrador del demandante no está sostenida por la prueba. El artículo 1613 del Código Civil Revisado dispone que el mandato se supone gratuito y esta presunción no aparece destruida mediante pacto contrario que se hubiera estipulado entre las partes.

*En virtud de todo lo expuesto la sentencia de la corte inferior debe revocarse en cuanto declara con lugar la demanda, y confirmarse declarando sin lugar la contrademanda, todo sin especial condenación de costas.*

El Juez Presidente Señor del Toro no intervino en la vista de este caso.